JASON R. HULL [11202]
JHULL@MOHTRIAL.COM
**MARSHALL OLSON & HULL, PC**
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

ATTORNEYS FOR PLAINTIFFS AND
PROPOSED CLASS COUNSEL

NICKOLAS J. HAGMAN*
NHAGMAN@CAFFERTYCLOBES.COM
**CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP**
135 S. LASALLE, SUITE 3210
CHICAGO, ILLINOIS 60603
TELEPHONE: 312.782.4880

* PRO HAC VICE FORTHCOMING

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| THOMAS SABRE and ETHAN FABER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INSTRUCTURE, INC., <br><br><br> Defendant, | **COMPLAINT [PROPOSED CLASS ACTION]** <br><br> JURY TRIAL DEMANDED <br><br> Case No. 2:26-cv-391 |

Plaintiffs Thomas Sabre and Ethan Faber ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against Instructure, Inc. ("Instructure" or "Defendant"). Plaintiffs bring this action by and through their attorneys, and allege, based upon personal knowledge as to their own actions, and based upon information and belief and reasonable investigation by their counsel as to all other matters, as follows.

## I.  INTRODUCTION

1.  Instructure is an educational technology company that offers online learning management systems for educational institutions across the country.

2.  As part of its operations, Instructure collects, maintains, and stores highly sensitive "personally identifying information" ("PII" or "Private Information") from its users.

3.  On or before May 4, cybercriminals attacked Defendant's systems and successfully stole vast quantities of sensitive Private Information maintained by Defendant (the "Breach" or "Data Breach").

4.  Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for, *inter alia*, the consequences of Defendant's failure to reasonably safeguard their Private Information; its failure to reasonably provide a notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.  PARTIES

### Plaintiff Thomas Sabre

5.  Plaintiff Thomas Sabre is a resident and citizen of Shakopee, Minnesota. Plaintiff Sabre was a user of Instructure's products.

### Plaintiff Ethan Faber

6.      Plaintiff Faber is a resident and citizen of Mequon, Wisconsin. Plaintiff Faber was a user of Instructure's products.

**Defendant Instructure**

7.      The Instructure is a Utah corporation with its principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, UT 84720. Defendant conducts business in this District and throughout Utah.

### III.    JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

9.      This Court has personal jurisdiction over Defendant because Defendant is headquartered in Utah.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District and because Defendant resides in this District.

### IV.    FACTUAL ALLEGATIONS

A.      **Instructure – Background**

11.     Instructure is a company that provides online learning management products to educational institutions and is used by millions of educational staff and students nationwide.

12.    As an education services provider, Instructure collects, maintains, and stores large volumes of Private Information belonging to its current and former users as part of its general business operations.

13.    Upon information and belief, Instructure failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of Instructure's current and former customers and users—Plaintiffs and Class members, through its product Canvas.

14.    Current and former customers and users of Instructure, and its product Canvas, such as Plaintiffs and Class members, made their Private Information available to Instructure with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

15.    This expectation was objectively reasonable and based on an obligation imposed on Instructure by statute, regulations, industrial custom, and standards of general due care.

16.    Had they known that Defendant's systems were vulnerable and open to attack, Plaintiff and Class members, as reasonable individuals, would not have provided their Private Information from Defendant.

17.    Unfortunately for Plaintiffs and Class members, Instructure failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiffs and Class members from having their Private Information accessed and stolen during the Data Breach.

**B.      The Data Breach**

18.    The ransom group ShinyHunters claims that it breached Instructure's information systems on or about May 1 and claimed it exfiltrated Private Information from 275 million users from approximately 9,000 educational institutions.[1]

19.    Defendant has released a statement stating that it experienced a cybersecurity incident, but has not disclosed what Private Information has been affected, the cause of the breach, nor the number of individuals affected.[2]

**C.      Instructure's Many Failures Both Prior to and Following the Breach**

20.    The Data Breach and the injuries it caused to Plaintiffs and Class members occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

21.    First, Defendant inexcusably failed to implement reasonable security protections to safeguard its information systems and databases.

22.    Second, Defendant failed to timely detect this data breach with Defendant's computer systems. This provided cybercriminals with unrestricted access during which time they could freely browse and steal sensitive information from Defendant's systems.

23.    Third, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiffs and Class members been aware that Defendant did not have adequate safeguards in place to protect such sensitive Private Information, they would have never provided such information to Defendant.

24.    Fourth, Defendant has yet to formally notify Plaintiffs and Class Members regarding the breach, and this unreasonably delay permits the cybercriminals who stole this Private

---

[1] Chad De Guzman, "What to Know About the Canvas Cyberattack That's Affected Thousands of Schools," TIME MAGAZINE (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know.

[2] *Id.*

Information to freely monetize, misuse and/or disseminate that Private Information before the Plaintiffs and Class members can take any affirmative steps to protect their sensitive information and mitigate their resulting injuries and damages.

25.    Plaintiffs' and Class members' Private Information was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their Private Information. And this can, and in some circumstances already has, caused irreparable harm to their personal, financial, reputational, and future well-being.

**D.    Data Breaches are Prevalent**

26.    While the prevalence and severity of data breaches have increased exponentially over the past five years, the illicit trade of stolen data dates back to the earliest days of the internet. In the 1990s, cybercriminals sold stolen data through Internet Relay Chat (IRC) channels, which were primitive message boards and instant messaging services, before transitioning to dedicated web forums in the early 2000s.[3] These forums became havens for cybercriminals of all stripes where "individuals advertised their services to other users. Forums quickly gained popularity and became successful businesses with vendors selling stolen credit cards, malware, and related goods and services to misuse personal information and enable fraud."[4]

27.    A forum known as ShadowCrew, which operated for just two years before being shut down by a law enforcement task force operation in 2004, served as the most prominent port

---

[3] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.
[4] *Id.*

of call during this era, and its members managed to traffic over 1.7 million stolen credit card details in the brief period of time it was online.[5]

28.     The end of ShadowCrew did not dampen the illicit trade in stolen data. Instead, the trade moved to the dark web where it thrives to this day. Gone are the days of archaic IRC channels and dusty forums; stolen data is now traded on dedicated webpages serving as veritable e-commerce stores (akin to Amazon, eBay, and Alibaba) for stolen data of all kinds, complete with eye-catching webpages, distinct branding, and advertising to attract customers.[6] The vendors operating from these dark web storefronts are "frequently offer discounts and promotions to buyers to attract customers and keep them loyal," and offer clearance sales on old and/or expiring inventory, such as expiring credit card numbers, in a macabre reflection of commercial practices from the right side of the law.[7]

29.     This decades-old black market for stolen data continues to thrive, and stolen PII, PHI, and financial account information are exchanged as simple commodities with prices set by the brutal and invisible hand of economics. Typically, online banking login information can be purchased for $100 each, full credit card details can be purchased for between $10 and $100, and comprehensive data packages which can enable complete theft of an individual's identity can be purchased for $1,000 or more.[8]

30.     For criminals, the ROI on purchased information can be exceptional despite the dubious nature of black-market dealings and the inherent risks therein. For example, a cybercriminal "who buys 100 cards for $500 can recoup costs if only 20 of those cards are active

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

and can be used to make an average purchase of $30."[9] Based on these incentives, data breaches "are likely to continue as long as there is demand for illicit, profitable data."[10]

31.    In this thriving black market, the producers are the cybercriminals who steal information to sell. And fueled by the voracious demand for stolen data in this thriving black market, dedicated gangs and organized crime rings have stepped up to meet the market demand, which has resulted in a precipitous increase in the number of data breaches in recent years.

32.    The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2025 listed 3,322 data breach incidents which occurred in 2025, for which 232,726,796 individual victim notices were dispatched.[11] Indeed, 2025 handily dethroned 2023 as the most prolific year for data breaches, which previously held the title with 3,205 data breaches for which over 420 million individual victim notices were dispatched.[12]

33.    Data breaches show no sign of abating. Statista, a German entity that collects and markets data relating to, *inter alia*, data breach incidents and the consequences thereof, reported 3,322 data breach incidents in the United States in 2025, 3,152 data breach incidents in 2024, 3,205 incidents in 2023, and 1,798 incidents in 2022.[13]

---

[9] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (November 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.
[10] *Id.*
[11] *2025 Data Breach Report*, Identity Theft Resource Center (January 2026), available at https://www.idtheftcenter.org/publication/2025-data-breach-report/.
[12] *Id.*
[13] *Number of data compromises and individuals impacted in the United States from 2021 to 2025*, Statista (February 15, 2026), available at https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/.



Figure 1 – *Number of Data Breaches and Affected Individuals from 2005 to 2024.*[14]

## E.    The Theft and Sale of Data Harms Victims

34.    Individuals who have unfortunately had their information stolen and sold on the black-market face severe consequences which belie the blatant ubiquity of such transactions. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches strongly correlate to an increased risk of identity theft for victimized consumers, with one in four victims of a data breach inevitably experiencing some type of identity theft.[15]

---

[14] *Id.*

[15] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.

35.     Using this stolen information, criminals and other unsavory groups can fraudulently take out loans under the victims' names, open new lines of credit, open new bank accounts for purposes of committing fraud, and file fraudulent tax returns using stolen credentials.[16]

36.     Victims can even face criminal charges as a result of identity theft and typically experience significant emotional distress:

> Having your identity stolen can be traumatic. Nearly 9 in 10 respondents (87%) in the ITRC survey reported feeling anxious or worried in the wake of identity theft; 77% felt violated, and an alarming 16% reported feeling suicidal in the months following identity theft. Identity theft victims report feeling unable to trust friends (34%) and family members (33%). More than half (52%) say they feel embarrassed or ashamed, even though ID theft can be difficult for the average person to detect and thwart, and some forms of identity theft, such as data breaches, are beyond the victims' control. Shame, suspicion and a feeling you should be curtailing your activity to prevent further theft can lead to isolation.[17]

37.     These difficulties compound when Social Security numbers are compromised in the Breach. A victim is forbidden from proactively changing his or her number unless and until they can prove actual misuse and harm, and even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[18]

38.     The consequences of identity theft do not resolve quickly. In a survey of identity theft victims conducted by the Identity Theft Research Center (ITRC), 77% of respondents

---

[16] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[17] Gayle Sato, What Are the Unexpected Costs of Identity Theft? Experian (July 30, 2024), available at https://www.experian.com/blogs/ask-experian/what-are-unexpected-costs-of-identity-theft/.

[18] *Id.*

10

reported having at least some financial problems following identity theft, with 61% saying they had difficulty covering basic needs. Although 28% said they resolved their issues within six months of an ID theft incident, 65% said issues remained unresolved even after a year.[19]

39.    On average, victims of identity theft spend $1,200 to restore their identity and resolve damage to their credit, which includes payments to specialists and attorneys and lost wages.[20]

40.    Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[21]

41.    Furthermore, even if only a select few categories of Private Information is compromised in a breach, cybercriminals can use these pieces of stolen information to create a "mosaic" of information on each victim. In effect, cybercriminals can use the information stolen in one breach and connect it to other available information on the victims, which are data-mined from publicly available sources or illegally obtained from other breaches. Thus, even if certain categories of information such as emails, phone numbers, or credit card information were not compromised in this Data Breach, criminals can easily 'fill in the blanks' using these "mosaics" and correctly answer security questions and pass 2FA security checks, granting them access to victims' email accounts, financial accounts, and social media accounts to cause havoc.

---

[19] *Id.*

[20] Alexandria White and Dan Avery, What is identity theft insurance? CNBC Select (March 17, 2025), available at https://www.cnbc.com/select/id-theft-insurance/#:~:text=Victims%20of%20identity%20theft%20spend,lost%20wages%20and%20other%20expenses.

[21] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymBhAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_BwE&gclsrc=aw.ds.

42.     A particularly troubling extension of these "mosaics" is the creation of "Fullz" packages. A "Fullz" package is a comprehensive dossier of information that cybercriminals compile on individuals, often through the use of automated programs, which represents an alarmingly accurate and complete profile of a given individual. These "Fullz" packages are sold for profit on the dark web to any individual willing and able to pay the price, be they cybercriminals seeking to perpetuate financial crimes, stalkers seeking information on their targets, or rivals seeking to destroy someone's reputation.

43.     Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiffs and the Class. And any reasonable for any trier of fact will find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

## F.     Defendant Had a Duty and Obligation to Protect Private Information

44.     Defendant has an obligation to protect the Private Information belonging to Plaintiffs and Class members. First, this obligation was mandated by government regulations and state laws, including FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive records containing Private Information. Third, Defendant imposed such an obligation on itself with its promises regarding the safe handling of data. Plaintiffs and Class members provided, and Defendant obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

## 2.    FTC Act Requirements and Violations

45.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

46.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[22] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[23] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24] Defendant clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

---

[22] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[23] *Id.*
[24] *Id.*

47.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

48.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49.     As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

50.     Defendant was fully aware of its obligation to protect the Private Information of its current and former users, including Plaintiffs and Class members. Defendant is a sophisticated and technologically savvy business that relies extensively on technology systems and networks to maintain its practice, including storing its users' PII Private Information in order to operate its business.

51.     Defendant had and continues to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendant and Plaintiffs and Class members. Defendant alone had the exclusive ability to implement adequate security

14

measures to its cyber security network to secure and protect Plaintiffs' and Class members' Private Information.

### 3.    Industry Standards and Noncompliance

52.    As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

53.    Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

54.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[25]

55.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

    a.    Control who logs on to your network and uses your computers and other devices.

    b.    Use security software to protect data.

---

[25] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited Feb. 11, 2026).

c.  Encrypt sensitive data, at rest and in transit.

d.  Conduct regular backups of data.

e.  Update security software regularly, automating those updates if possible.

f.  Have formal policies for safely disposing of electronic files and old devices.

g.  Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

56.    Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[26]

57.    Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0

---

[26] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 11, 2026).

(including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

58.    Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### 4.    Defendant's Own Stated Policies and Promises

59.    Defendant's own published privacy policy states that[27]:

> Instructure is committed to protecting the information we process by doing our best to ensure that the information is used only to support students and education

And,

> **Security:** We will implement and maintain appropriate technical, administrative, and organizational measures to protect data in accordance with regulatory requirements.
>
> **Confidentiality:** We will establish and maintain policies, procedures, and practices that limit access to data and protect against unlawful or unintentional access or disclosure

60.    Defendant failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate its systems and steal the Private Information belonging to Plaintiffs and Class members.

---

[27] *Privacy Policy*, Instructure, https://www.instructure.com/policies/product-privacy-policy (last edited Oct. 31, 2025).

17

## G.    Plaintiffs and the Class Suffered Harm Resulting from the Data Breach

61.    Like any data hack, the Data Breach presents major problems for all affected.[28] As discussed in detail above, Plaintiffs and the Class are highly likely to experience identity theft as a result of the Data Breach and, as also discussed in detail above, they are highly likely to experience significant harm as a result.

62.    Here, due to the Breach, Plaintiffs and Class members have been exposed to injuries that include, but are not limited to:

   a.    Theft of Private Information;

   b.    Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

   c.    Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

   d.    Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendant's delay in disseminating notice in accordance with state law;

   e.    The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

   f.    The loss of Plaintiffs' and Class members' privacy.

---

[28] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

63. As a direct and proximate result of Defendant's acts and omissions in failing to protect and secure Private Information, Plaintiffs and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

64. Plaintiffs retain an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## G.    EXPERIENCES SPECIFIC TO PLAINTIFFS

### *Plaintiff Thomas Sabre*

65. Plaintiff Sabre is a student and user of Instructure's online educational management products, including Canva.

66. Plaintiff Sabre received a notice through his University Provost at the University of Madison Wisconsin that Canva was experiencing an outage. Through his Canva portal he received a notice from ShinyHunters that they had improperly accessed and obtained the Private Information that was in Defendant's possession at the time of the Data Breach.

67. After the Data Breach, Plaintiff Sabre has experienced a significant increase in the amount of spam and scam calls and text messages.

68. As a result of the Data Breach, Plaintiff Sabre has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Sabre has also spent several hours dealing with the Data Breach, valuable time Plaintiff Sabre otherwise would have spent on other activities, including, but not limited to, work and recreation.

69.    As a result of the Data Breach, Plaintiff Sabre has suffered anxiety due to the public dissemination of Plaintiff Sabre personal information, which Plaintiff Sabre believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using Sabre's Private Information for purposes of identity theft and fraud. Plaintiff Sabre is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

70.    Plaintiff Sabre suffered actual injury from having Plaintiff Sabre's Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Plaintiff Sabre's Private Information, a form of property that Defendant obtained from her; (b) violation of Plaintiff Sabre's privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

71.    As a result of the Data Breach, Sabre anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach Plaintiff Sabre is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Ethan Faber

72.    Plaintiff Faber is a student and user of Instructure's online educational management products, including Canva.

73.    Plaintiff Faber received a notice through his University Provost at the University of Madison Wisconsin that Canva was experiencing an outage. Through his Canva portal he received a notice from ShinyHunters that they had improperly accessed and obtained the Private Information that was in Defendant's possession at the time of the Data Breach.

20

74. After the Data Breach, Plaintiff Faber has experienced a significant increase in the amount of spam and scam calls and text messages.

75. As a result of the Data Breach, Plaintiff Faber has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Faber has also spent several hours dealing with the Data Breach, valuable time Plaintiff Faber otherwise would have spent on other activities, including, but not limited to, work and recreation.

76. As a result of the Data Breach, Plaintiff Faber has suffered anxiety due to the public dissemination of Plaintiff Faber personal information, which Plaintiff Faber believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using Faber's Private Information for purposes of identity theft and fraud. Plaintiff Faber is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

77. Plaintiff Faber suffered actual injury from having Plaintiff Faber's Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Plaintiff Faber's Private Information, a form of property that Defendant obtained from her; (b) violation of Plaintiff Faber's privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

78. As a result of the Data Breach, Faber anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach Plaintiff Faber is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come

## V.    CLASS REPRESENTATION ALLEGATIONS

79.    Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

80.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process. On information and belief, the number of affected individuals estimated to be in the hundreds of millions.[29] The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

81.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

      a.    When Defendant learned of the Data Breach;

      b.    Whether hackers obtained Class members' Private Information via the Data Breach;

      c.    Whether Defendant's response to the Data Breach was adequate;

---

[29] Chad De Guzman, "What to Know About the Canvas Cyberattack That's Affected Thousands of Schools," TIME MAGAZINE (May 8, 2026), https://time.com/article/2026/05/08/canvas-cyber-attack-shinyhunters-hack-what-to-know.

22

d.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

f.  Whether Defendant owed a duty to safeguard their Private Information;

g.  Whether Defendant breached its duty to safeguard Private Information;

h.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

i.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

j.  Whether Defendant's conduct violated the FTCA;

k.  Whether Defendant's conduct was negligent;

l.  Whether Defendant's conduct was *per se* negligent;

m.  Whether Defendant was unjustly enriched;

n.  What damages Plaintiffs and Class members suffered as a result of Defendant's misconduct;

o.  Whether Plaintiffs and Class members are entitled to actual and/or statutory damages; and

p.  Whether Plaintiffs and Class members are entitled to additional credit or identity monitoring and monetary relief.

82.  <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class as Plaintiffs and all members of the Class had their Private Information compromised in the Data Breach. Plaintiffs' claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

23

83.     Adequacy: Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are antagonistic to the interests of other members of the Class.

84.     Superiority: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (By Plaintiffs on behalf of the Class)

85.     Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 85 as if fully set forth herein.

86.     Defendant owes a duty of care to protect the Private Information belonging to Plaintiffs and Class members. Defendant also owes several specific duties including, but not limited to, the duty:

    a.     to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.     to protect users' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

    c.     to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

    d.     to employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class members pursuant to the FTCA;

    e.     to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    f.     to promptly notify Plaintiffs and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

87.     Defendant also owes this duty because it had a special relationship with Plaintiffs' and Class members. Plaintiffs and Class members entrusted their Private Information to Defendant on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendant had the ability to protect its systems and the Private Information stored on them from attack.

88.     Defendant also owes this duty because industry standards mandate that Defendant protect its users' confidential Private Information.

89.     Defendant also owes a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiffs and Class members. This duty exists to provide Plaintiffs and Class members with the opportunity to undertake appropriate measures to mitigate

damages, protect against adverse consequences, and thwart future misuse of their Private Information.

90.     Defendant breached the duties it owed to Plaintiffs and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

91.     Defendant also breached the duties it owed to Plaintiffs and Class members by failing to timely and accurately disclose that their Private Information had been improperly acquired and/or accessed.

92.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanently increased risk of identity theft.

93.     Plaintiffs and Class members were foreseeable victims of any inadequate security practices on the part of Defendant and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

94.     In failing to provide prompt and adequate individual notice of the Data Breach, Defendant also acted with reckless disregard for the rights of Plaintiffs and Class members.

95.     Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems

and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiffs on behalf of the Class)**

96.     Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 85 as if fully set forth herein.

97.     Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendant to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiffs and Class members.

98.     Defendant violated the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiffs' and Class members' Private Information.

99.     Defendant's failure to comply with the FTCA constitutes negligence *per se*.

100.     Plaintiffs and Class members are within the class of persons that the FTCA is intended to protect.

101.     The relevant portions of the FTCA inform Defendant's duties, particularly with regard to Defendant's duty to protect Private Information in its possession.

102.     It was reasonably foreseeable that Defendant's breach of its duties, by failing to protect and secure Plaintiffs' and Class members' Private Information in compliance with FTCA standards, would result in that information being accessed and stolen by unauthorized actors and cybercriminals.

103.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class members have suffered, and continue to suffer, injuries and damages arising from the

27

unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

104.    Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (By Plaintiffs on behalf of the Class)

105.    Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 85 as if fully set forth herein.

106.    Plaintiffs and Class members provided Defendant with their Private Information as an integral and necessary part of receiving educational services.

107.    Plaintiffs and the Class, on one hand, and Defendant, on the other hand, entered into implied-in-fact contracts which included a provision that Defendant would safeguard and protect the confidentiality of Private Information belonging to Plaintiffs and the Class. In effect, Defendant agreed to provide reasonable and adequate data security to Private Information in its possession.

108.    The terms of these implied contracts, including the provision requiring Defendant to maintain reasonable data security measures, are described in federal laws, state laws, and industry standards, as alleged above. In addition, Defendant expressly adopted and assented to these terms in its public statements, representations and promises as described above.

109.    The implied contracts for data security also obligated Defendant to provide Plaintiffs and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information, as is consistent with industry custom and statutory requirements.

110.    Defendant breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private Information belonging to Plaintiffs and Class members; allowing unauthorized persons to access Plaintiffs' and Class members' Private Information; and by failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiffs and Class members, as alleged above.

111.    As a direct and proximate result of Defendant's breaches of the implied contracts, Plaintiffs and Class members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information. Thus, Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(By Plaintiffs on behalf of the Class)**

112.    Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 85 as if fully set forth herein.

113.    This count is brought in the alternative to Count III.

114.    Plaintiffs and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Defendant.

115. Plaintiffs and Class members conferred their payment and Private Information with the understanding that a portion of the payment would be used to implement data security sufficient to adequately protect their Private Information. As such, a portion of the conferred payment represented a benefit that was to be used for a specific purpose.

116. Defendant was directly benefitted by the payments it received from Plaintiffs and Class members, as these payments represented revenue that it used for business purposes and financial gain. As alleged above Defendant knew, or should have known, that it was supposed to spend a portion of its revenues on adequate data security measures to prevent the theft or compromise of Private Information.

117. However, upon information and belief, Defendant did not spend that portion of its revenues on adequate data security measures such as employee training, operation protocols, and firewalls, that would have prevented the Data Breach. Instead, upon information and belief, it opted for cheaper and inadequate data security measures and elected to increase its profits instead. Thus, Defendant knowingly and opportunistically elected to increase its own profits at the expense of Plaintiffs and Class members.

118. By refusing to spend on data security the part of the payment that was conferred with that express purpose, Defendant knowingly and deliberately enriched itself at the expense of Plaintiffs and Class members. This represents an inequitable, unfair, and unconscionable practice and state of affairs.

119. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain its engorged profits which it unfairly and unconscionably gained at the expense of Plaintiffs and Class members.

120.    Defendant is therefore liable to Plaintiffs and the Class for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the enhanced profits Defendant gained by not implementing and adopting reasonable data security measures that would have prevented the Data Breach. Plaintiffs and Class members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT VI
## INVASION OF PRIVACY
### (By Plaintiffs on behalf of the Class)

121.    Plaintiffs incorporate and reallege all allegations in Paragraphs 1 through 93 as if fully set forth herein.

122.    Plaintiffs and Class members had a reasonable expectation of privacy in the Private Information that Defendant possessed and/or continues to possess.

123.    By failing to keep Plaintiffs' and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendant invaded Plaintiffs' and Class members' privacy by:

      a.    Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.    Publicizing private facts about Plaintiffs and Class members, which is highly offensive to a reasonable person.

124.    Defendant knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' position would consider Defendant's actions highly offensive.

125.    Defendant invaded Plaintiffs' and Class members' right to privacy and intruded into Plaintiffs' and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

126. As a proximate result of such misuse and disclosures, Plaintiffs' and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a serious invasion of Plaintiffs' and Class members' protected privacy interests.

127. In failing to protect Plaintiffs' and Class members' Private Information, and in misusing and/or disclosing their Private Information, Defendant has acted with malice and oppression and in conscious disregard of Plaintiffs' and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its customers and users. Plaintiffs, therefore, seek an award of damages, including punitive damages, on behalf of themselves and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiffs and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D. That the Court award Plaintiffs and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F. That the Court award pre- and post-judgment interest at the maximum legal rate;

32

G.      That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.      That the Court grant all other relief as it deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 8, 2026

**MARSHALL OLSON & HULL, PC**

BY:      /s/Jason R. Hull
         JASON R. HULL

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
         NICKOLAS J. HAGMAN*

*Attorneys for Plaintiff and the Proposed Class*

*\* pro hac vice forthcoming*

33